UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION AT LAFAYETTE

GINA SIZEMORE,                    )
                                  )
        Plaintiff,                )
                                  )
        v.                        )        Case No. 4:11-CV-00013-JD
                                  )
MICHAEL J. ASTRUE,                )
Commissioner of Social            )
Security,                         )
                                  )
        Defendant.                )

**OPINION AND ORDER**

Plaintiff Gina Sizemore ("Sizemore") filed a complaint on February 11, 2011 [DE 1]

seeking review of the final decision of the Defendant Commissioner of Social Security

("Commissioner"). With the filing of the opening brief [DE 14], response brief [DE 20], and

reply brief [DE 21], this matter is ripe for ruling.

Sizemore initiated her disability claim by filing a Title II application for disability

insurance benefits on September 24, 2007, alleging disability beginning on February 6, 2007 due

to heart problems and mental problems. (Tr. 61, 111, 146). The claim was denied on January 28,

2008, and again on reconsideration on May 28, 2008. (Tr. 63, 69). Sizemore requested a hearing

(Tr. 72), which was held on December 22, 2009 before Administrative Law Judge Daniel Mages

("ALJ"). (Tr. 26-60). Sizemore was represented by counsel, and the ALJ heard testimony from

Sizemore (Tr. 30-51), Sizemore's husband Ken Sizemore (Tr. 52-53), and Vocational Expert

Ronald Barkhaus, Ph.D. ("VE") (Tr. 53-59). On March 5, 2010, the ALJ issued a decision

concluding that Sizemore was not disabled under the meaning of the Social Security Act ("the

Act") because she retained the residual functional capacity ("RFC")[1] to perform jobs that exist in sufficient numbers in the economy. (Tr. 11, 19-20). The Appeals Counsel denied Sizemore's request for review on December 22, 2010, making the ALJ's decision the final decision of the Commissioner. (Tr. 1-3). On February 11, 2011, Sizemore filed a complaint in this Court seeking judicial review of the Commissioner's final decision. [DE 1]. Jurisdiction is established pursuant to 42 U.S.C. § 405(g).

## I.  Factual Background

Gina Sizemore was 38 years old at the time of her onset date, and 41 years old at the time of the ALJ's decision. (Tr. 30). Sizemore is a high school graduate who has been taking some college classes since August 2007. (Tr. 32). Sizemore previously worked as an office clerk, but she has not worked or searched for employment since her alleged onset date. (Tr. 33). Sizemore is insured for the purposes of the Act's status requirements through December 31, 2012. (Tr. 11).

## A.  Medical Evidence:  Physical Impairments

Sizemore suffers from a series of physical impairments including coronary artery disease ("CAD"), degenerative disc disease and back pain, obstructive pulmonary disease, shortness of breath, deep vein thrombosis, headaches, morbid obesity, and residual effects due to gastric bypass surgery. (Tr. 233-977).

In February 2007, Sizemore was hospitalized for 10 days and underwent triple bypass open heart surgery. (Tr. 400-04). She was reported as having CAD and left main defection, which required emergent revascularization of her anterior descending artery. (Tr. 236). After her discharge on February 16, Sizemore returned and was readmitted with complaints of shortness of

---

[1] Residual Functioning Capacity is defined as the most a person can do despite any physical and mental limitations that may affect what can be done in a work setting. 20 C.F.R. § 404.1545(a)(1).

breath and pressure-like symptoms in her chest.  An echocardiogram showed preserved left ventricular systolic function and no evidence of thrombus with an ejection fraction of 55%, abnormal septal motion due to a past coronary artery bypass graft surgery, mild aortic valve sclerosis, trace mitral, tricuspid, and pulmonary regurgitation. (Tr. 241-42). A venous Doppler and CT scan showed acute pulmonary embolism. (Tr. 418-21).  Sizemore was discharged on March 8, 2007, to normal activity except she still used oxygen when needed, she had a 20 pound lifting restriction until mid-May, and she was instructed to elevate her legs above her heart to help improve her edema. (Tr. 452).

On May 18 and 22, 2007 Dr. Stanley Rich, Sizemore's cardiologist,[2] indicated in an attending physician's statement requested by Sizemore's employer that Sizemore had been totally unable to work since February 5, 2007 due to her pulmonary embolism, CAD, deep vein thrombosis, and chronic anticoagulation, and that her estimated return to work date was "TBA." (Tr. 438-42).  Sizemore was not to lift over 20 pounds and was to use her oxygen as needed.  The forms indicated that supporting treatment records were also forwarded.  Similar forms were later filled out on July 2, 2007 and August 10, 2007, also indicating that Sizemore was unable to work and that her return date was still undetermined. (Tr. 437, 464).  Also on July 17, 2007, a form for disability was filled out indicating that Sizemore could walk short distances at a slow pace for about 10 minutes, she was restricted to lifting no more than 2 pounds, and she had muscle fatigue and atrophy during activity. (Tr. 467-68).

On June 27, 2007, Sizemore began cardiac rehabilitation therapy. (Tr. 459-60).  She

[2]There is some question as to who filled out some of the forms from Dr. Rich's office because the handwriting appears to be different when compared to his signatures.  However, no one questions the fact that Dr. Rich was Sizemore's treating cardiologist and that these records are treatment notes which originated from his office.

continued these sessions until August 24, 2007, when she was discharged because she had been unable to regularly attend sessions during the previous month due to issues outside of her own health. At the time of the discharge, her exercise tolerance had improved to 60 minutes of light to moderate intensity without symptoms or complaints.

On August 28, 2007, Sizemore visited Dr. Nalamolu for a surgery followup. (Tr. 295). Dr. Nalamolu noted that Sizemore was not experiencing chest pain or shortness of breath. She was diagnosed with CAD status post bypass grafting, bilateral tibial vein thrombosis in the leg and pulmonary embolus, and decreased protein S level which was likely related to her taking Coumadin. A pulmonary function test in September 2007 showed possible early obstructive pulmonary impairment. (Tr. 353).

On December 6, 2007, Sizemore was examined by state agent consulting physician Dr. Merkle who noted that Sizemore's claim was based on her documented history of severe major depression in the aftermath of multiple complications following a cardiac catheterization, stent placement, coronary dissection requiring emergent triple coronary artery bypass grafting, deep vein thrombosis, and pulmonary emboli. (Tr. 573-77). Sizemore complained of being anxious, irritable, and depressed, although she denied any suicidal tendencies. She also complained of being extremely fatigued on a daily basis, crying every day, and experiencing myalgia, dizziness, and nausea. Sizemore told Dr. Merkle that she was unable to walk more than half a city block without stopping, unable to climb stairs, and she experienced pain when she tried to twist, bend, lift, pull, push, or strain. Dr. Merkle noted that Sizemore was morbidly obese and was so severely depressed that her Global Assessment of Functioning Score ("GAF") was estimated to

be below 30.[3]  Dr. Merkle reported that "although there is no doubt that she has had serious disease with multiple complications of her coronary surgery, her depression seems to be paramount . . . she would benefit from formal psychiatric intervention[,] [and] [t]here is no doubt, in [his] clinical opinion, that she presents with a significant impairment in function." He listed almost 20 prescriptions that she took, and documented that she had frequent headaches, her posture and gait were unaffected, she had only minimal difficulty getting on and off the examination table, and she seemed fatigued but not dyspnic.  Sizemore had no ability to hop, squat, or kneel and had some difficulty with heel and toe walking.  She had a reduced range of motion in her lower back, shoulders (abduction and forward elevation), and knees (flexion).  She had normal sensation, reflexes, and grip strength.  Dr. Merkle concluded that Sizemore had major depression, CAD, morbid obesity, chronic reactive airway disease with asthma, generalized anxiety, restless leg syndrome, and underlying cardiometabolic syndrome (hypertension, obesity, hyperlipidemia, hyperglycemia, and insulin resistance).  Dr. Merkle opined that Sizemore was unable to engage in any gainful activity and she suffered from a marked limitation of functional capacity due to her underlying disease and surgical complications, but also primarily related to her major depression.  Dr. Merkle believed that her prognosis for significant meaningful recovery or improvement in function in the near future was poor, and depending on her progress in cardiac rehabilitation and psychiatric therapy she could

---

[3]A GAF score measures a clinician's judgment of the individual's overall level of psychological, social, and occupational functioning. *See* AM. PSYCHIATRIC ASS'N, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 32 (4th ed., text rev. 2000). The higher the GAF score, the better the individual's psychological, social, and occupational functioning. A GAF score of 21-30 indicates that behavior is considerably influenced by delusions or hallucinations or serious impairment, in communication or judgment (e.g. sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) or inability to function in almost all areas (e.g. stays in bed all day, no job, home, or friends).

be a candidate for vocational rehabilitation in the future.

On January 2, 2008, Sizemore went to the emergency room with complaints of back pain, arm heaviness, shortness of breath, and nausea. (Tr. 586-605). Walking or using her arms seemed to cause the back and arm discomfort to be more pronounced. Tests were negative for pulmonary embolism, and Dr. Hazen believed that the pain was related to recent increased physical activity. Dr. Rich was made aware of Sizemore's condition as her treating cardiologist.

On January 15, 2008, Dr. Rich noted that Sizemore was attending a physical fitness program but was unable to walk more than five minutes at 1.8 miles per hour, and that her physical condition was too poor for him to conduct an exercise study. (Tr. 610).

On January 17, 2008, state agency reviewing physician Dr. Ruiz completed a physical RFC assessment of Sizemore (Tr. 611-18). Dr. Ruiz opined that Sizemore had the following abilities: occasional and frequent lifting/carrying of 10 pounds; standing/walking for at least 2 hours in an 8 hour workday; sitting for at least 6 hours in an 8 hour workday; and unlimited ability to push/pull other than the lift/carry restriction. He noted that Sizemore had an unremarkable gait, slightly decreased range of motion in the lower spine, shoulders, and knees, a body mass index ("BMI") of 45, and poor physical conditioning. Furthermore, Dr. Ruiz found that Sizemore could never climb ladders, ropes, or scaffolds, but she could occasionally climb ramps or stairs, balance, stoop, kneel, crouch, crawl, and reach overhead (with unlimited sense of feel and ability to use her hands for gross and fine manipulation). She had no visual or communication limitations. Dr. Ruiz recommended that Sizemore avoid concentrated exposure to extreme cold or heat, wetness, and humidity, and avoid moderate exposure to fumes, odors, dusts, gases and poor ventilation, but she had no limitations with working around noise,

vibrations, or hazards.

On May 27, 2008, state agent Dr. J.V. Corcoran reviewed the evidence in Sizemore's file and affirmed Dr. Ruiz's January 2008 assessment. (Tr. 662).

On October 30, 2008, Dr. Rich completed a statement of functionality for Sizemore's long-term disability benefits. (Tr. 847-48). Dr. Rich reported that Sizemore had been diagnosed with having chest pain, CAD, and hypertension and his physical examination findings included obesity, post bariatric surgery, and depression. Dr. Rich opined that Sizemore could sit for more than 6 hours in a workday; could stand for 1 hour in a workday; could walk for 1 hour in a workday; could not lift or carry any weight; and, she could not kneel, crouch, or reach above her shoulder with either arm. Dr. Rich also concluded that Sizemore could only occasionally bend at the waist, reach below the waist, and drive, but she could frequently reach at the waist (desk level). Dr. Rich noted that Sizemore became disabled on February 5, 2007 (the date of her bypass surgery), that he did not know the expected duration of her current limitations, and that her return to work date was undetermined.

A December 2008 pulmonary function test again showed possible early obstructive pulmonary impairment. (Tr. 921).

On December 1, 2008, x-rays showed mild facet joint degeneration of the lower spine and marginal endplate osteopyhtes in the lower thoracic region. (Tr. 754). An MRI on December 5, 2008, showed a small central disc protrusion at L4-5 with minimal mass-effect and facet degenerative changes at the same level, greater on the left side than on the right side. (Tr. 747). On December 15, 2008, Sizemore visited her primary care doctor, Dr. Mattox, complaining of lower back pain. (Tr. 796-97). Dr. Mattox's assessment was degeneration of

lumbar or lumbosacral intervertebrae and he prescribed Darvocet.

On January 13, 2009, orthopaedist Dr. Kevin Rahn diagnosed Sizemore with L4-5 and L5-S1 stenosis and mild acute right radiculopathy. (Tr. 941). Dr. Rahn recommended a nerve root block on the right. On February 12, 2009, Sizemore returned after the nerve block was unsuccessful. (Tr. 939-40). Dr. Rahn then recommended a decompression and laminotomy surgery.

On May 30, 2009, Sizemore went to the emergency room with complaints of increasing lower back pain and pain radiating down her right leg and foot. (Tr. 698-99). Dr. Kordish noted that Sizemore was crying and anxious, she had normal strength, and chronic back pain. (Tr. 704). Dr. Kordish indicated that the MRI which showed a small central disc protrusion at L4-L5 with an associated acute annular tear was unremarkable. (Tr. 705, 715).

A June 2009 pulmonary function test again showed possible early obstructive pulmonary impairment. (Tr. 921).

On August 6, 2009, Sizemore was complaining of shortness of breath. (Tr. 827). Because she was unable to exercise on the treadmill with her shortness of breath, she underwent a nuclear cardiology examination. The exam showed an abnormal perfusion study with suspicion for anterolateral wall ischemia, but a normal ejection fraction, normal left ventricular volumes, and normal wall motion. An echocardiography report revealed normal left ventricular size at the lower limits of normal functioning, trace aortic, mild mitral, and mild tricuspid regurgitation. (Tr. 893).

In early 2009, Sizemore was considering the option of undergoing low back surgery (Tr. 865-66), but on September 16, 2009, Sizemore sought non-surgical treatment options for her

back pain with Dr. Daniel Roth. (Tr. 975-76). Sizemore told Dr. Roth that she had pain in her lower back which was getting worse for months preceding the appointment. Dr. Roth's exam indicated that Sizemore had lumbar pain with extension and flexion, sacroiliac joint tenderness, and a positive straight leg raise test. Dr. Roth diagnosed Sizemore with right lumbar radiculopathy, occipital neuralgia, chronic pain syndrome, and depression, and he prescribed Ultram, Neutontin, and Robaxin, and recommended physical therapy.

Sizemore returned for a followup visit on October 14, 2009. (Tr. 970-72). Sizemore reported some improvements from a lumbar epidural steroid injection on the right side S1, but she still felt pain in her low back and right foot, and had difficulty sleeping due to pain. Sizemore had tenderness and facet loading in her neck, tenderness and pain with lumbar extension and flexion, and a positive straight leg test, but normal sensation, gait, and muscle strength. Dr. Roth further diagnosed Sizemore with headaches and cervical facet arthropathy, and increased her Neutontin.

Sizemore had a followup appointment with Dr. Roth on November 12, 2009, at which time she complained of constant radiating low back pain, and Dr. Roth again noted tenderness and facet loading in her neck and pain with certain ranges of motion in her back, as well as a positive straight leg test. (Tr. 965-67). Sizemore indicated that the pain was decreased with medication and laying in the fetal position on her left side, but it was aggravated by any activity and any movement. On November 19, 2009, Dr. Roth administered a lumbar epidural steroid injection on the left side S1. (Tr. 963).

In December, Sizemore saw Dr. Roth again for pain in her lower back, more on her right side than on her left side, and she reported a pain rating of 10 on a 1-10 scale. Dr. Roth reported

similar findings as before, recommended further steroid injections, added Elavil for her sleep

problems, and continued to opine that Sizemore suffered from right lumbar radiculopathy S1,

depression, headaches, chronic low back pain, and cervical facet arthropathy. (Tr. 960-63).

**B.    Medical Evidence:  Mental Impairments**

On June 28, 2007, Sizemore was evaluated by Dr. Frank Shao after complaining of

fatigue and sadness lasting for 5-6 months. (Tr. 341-43).  Dr. Shao diagnosed Sizemore with

major depressive disorder (recurrent) and assigned her a GAF score of 45-50.[4]  Dr. Shao

prescribed Effexor and discontinued her Zoloft because it was not helping.  Dr. Shao's treatment

notes indicate that he saw Sizemore again on July 26, August 3, August 15, and September 5,

2007. (Tr. 334-43).  By September, Dr. Shao noted that Sizemore's major depressive disorder

was in partial remission, and she was taking Effexor, Ambien, and Restoril.

On August 3, 2007, Sizemore was admitted to Parkview Behavioral Health with severe

depression which was not responding to outpatient treatment at the time. (Tr. 276-88, 338).

Sizemore indicated that for the past month she had been crying and feeling more depressed, and

she was experiencing decreased energy, increased sleep, and increased feelings of hopelessness

and guilt. It was thought that Sizemore suffered from obesity, history of coronary artery bypass

surgery, history of aortic dissection, apparent coagulation disorder with history of pulmonary

embolism and deep vein thrombosis, and depression.  Dr. Shao evaluated Sizemore and noted

that she reported being so depressed that she was not functional and she was crying all day in

bed.  She wished she was dead, but denied suicidal thoughts.  Dr. Shao noted that her depressive

---

[4]A GAF score of 41-50 indicates serious symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g. no friends, unable to keep a job).

episode had lasted at least 5 months, and that Zoloft, Celexa, and Lexapro did not help. Dr. Shao diagnosed her with major depression (depressive episode severe), physical disability and CAD, assigned her a GAF score of 30, and admitted her because she was unable to care for herself. Dr. Shao continued her prescriptions for Effexor and Ambien, discontinued her use of Trazodone, and recommended individual and group therapy. Three days later, Sizemore was discharged noting that after her prescriptions were again altered to discontinue medications that might cause fatigue, she seemed more hopeful and future oriented, and she no longer had a "death wish." She was diagnosed with major depression and assigned a GAF score of 35-40.[5] Further therapy was recommended.

On November 8, 2007, Sizemore was examined by state agent consulting psychologist Dr. Kenneth Bundza. (Tr. 551-54). Sizemore told Dr. Bundza that she struggled with a combination of health problems and secondary depression, and she suffered from short term memory loss, anergia, social isolation, sleep problems, and anhedonia. Sizemore denied problems with depression prior to her February 2007 surgery. Dr. Bundza noted that she maintained her independence with her personal activities of daily living, but her husband did almost all of the chores around the house and she would help with the laundry, cooking, and loading the dishwasher. She spent most of her time in bed, took frequent naps, and indicated that she did not see her friends. Dr. Bundza concluded that Sizemore did not have any major cognitive or intellectual impairments, but he noted that her intellectual efficiency appeared to have been affected by the residual effects of her heart surgery. He noted that Sizemore was alert

---

[5]A GAF score of 31-40 indicates some impairment in reality testing or communication (e.g. speech is at times illogical, obscure, or irrelevant) or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g. depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school).

and oriented to person and place, her long-term memory appeared intact, she had adequate communication skills, she was not in any acute emotional distress, and she was able to complete simple mental arithmetic problems, but she struggled with problems involving more than one mathematical operation. Dr. Bundza diagnosed Sizemore with major depressive disorder (single episode, severe without psychotic features), cognitive disorder NOS (not otherwise specified), CAD and history of triple bypass surgery with complications, psychological stressors and coping with serious health problems, and he assigned her a GAF score of 50.

On November 19, 2007, Dr. Gange completed a Mental RFC assessment and Psychiatric Review Technique. (Tr. 555-72). Dr. Gange noted that Sizemore had moderate limitations in her ability to understand and remember detailed instructions and moderate limitations in her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. Otherwise, Sizemore was not significantly limited in her ability to understand and remember simple instructions and work like procedures, or in her ability to maintain attention and concentration, socially interact, and adapt. Dr. Gange diagnosed Sizemore with cognitive disorder NOS and major depressive disorder (single episode, severe without psychotic features), and found that she was moderately restricted in her activities of daily living, had moderate limitations in her ability to maintain concentration, persistence, or pace, had mild difficulties in social functioning, and had no episodes of decompensation of an extended duration. There was no evidence establishing the presence of C criterion of any listed impairments enumerated in the Listing of Impairments found in 20 C.F.R. pt. 404, Subpt. P, Appendix 1 (referred to as Listings). Dr. Gange relied on Dr. Bundza's findings and believed that the medical evidence

supported the nature of Sizemore's symptoms, but did not think it supported the severity and limitations that Sizemore alleged. (Tr. 557). Dr. Gange opined that Sizemore was capable of performing simple routine tasks.

On May 27, 2008, Dr. Joseph Pressner reviewed the evidence in the file and affirmed Dr. Gange's November 19, 2007 assessment. (Tr. 663).

On October 14, 2008, Dr. Mattox reported that Sizemore's mental outlook had improved. (Tr. 810-12). Yet, on March 26, 2009, Sizemore saw Dr. Mattox for her anxiety, and Dr. Mattox noted that Sizemore was anxious, fearful, paranoid, exhibited poor judgment and a flight of ideas, had poor attention span and concentration, and had obsessive thoughts. (Tr. 789-91). Dr. Mattox opined that she had posttraumatic stress disorder and adjusted her medications.

## C.    Testimony of Claimant

On December 22, 2009, Sizemore testified before the ALJ. (Tr. 30-51). Sizemore indicated that prior to her alleged onset date, she worked as an office clerk since 1994, and most recently, she worked as an office clerk for an insurance company from 2000 until 2007.

Sizemore's daily activities center around household activities. Sizemore sorts and folds laundry, while her husband carries and puts it away. She eats breakfast and lunch but usually naps in the afternoon. She testified that she is an avid reader but sometimes she has to re-read passages because of her difficulty with concentrating or trouble remembering what she read. She typically spends 2 hours a day either studying for her college courses or working on the computer for those classes, and she testified that she prefers to take courses online because it is more relaxed, she can take her time, she does not have to lift anything, and she can lay down or walk around at any time. Sizemore cares for herself and helps cook, but she avoids cooking that

involves using pots and pans, lifting, or carrying items. Sizemore also helps with dishes and she sometimes helps with grocery shopping, however, she prefers not to grocery shop by herself because she struggles to push the cart or put heavier items into the cart or her car. Sizemore sometimes shops for light items or a small number of items by herself. Sizemore does not attend church or social events. She has difficulty sleeping because she struggles with pain which causes her to wake up and move around about every 2 hours.

Sizemore's alleged onset date occurred when she had triple bypass surgery in February 2007. After the surgery, Sizemore testified that she needed almost 30 days in the hospital to recover and she developed a pulmonary embolism and deep vein thrombosis in her legs and lungs. Since the surgery, she has continued to take medication to deal with blood clotting and pain. Sizemore stated that her pain is "about an 8 on a 10 scale," even with her medications. Her medications have several side effects; primarily, they make her tired and she has difficultly concentrating. She indicated that the pain in her legs and her balance problems are aggravated by walking a lot, such as by going shopping or to the park. Sizemore indicated that she is still restricted in her ability to lift because she gets dizzy and unstable with activity. She did not experience these problems or her fatigue before February 2007, and the problems have been consistent since then. Sizemore has not seen a physical therapist, nor has she used any type of ambulation device to assist with her walking. As she was instructed to do in March 2007, she elevates her legs so that they are straight which helps deal with swelling, and she testified that she becomes out of breath when she over exerts herself, such as by carrying things up the stairs or into her house from the car.

Sizemore had gastric bypass surgery performed in July 2008 because her doctor told her

that she would die if she failed to lose weight. Four weeks after the surgery, Sizemore experienced complications and had her gallbladder removed. She testified that she is now vitamin deficient and her body fails to properly absorb nutrients, which is something that she will have to deal with the rest of her life. As a result of the absorption problems, Sizemore eats and uses the restroom more frequently.

Sizemore testified that she has had headaches ever since she was 8 or 9 years old; however, her headaches intensified in the months preceding the hearing with the ALJ. She currently experiences headaches nearly every day. Her headaches cause pain throughout her head to the base of her neck, make it difficult to see, and cause her to lay down because motion and sound make her feel ill and unstable. Sizemore testified that about once or twice a week she experiences the type of headache that causes her vision problems and forces her to lay down.

In addition to the headaches, Sizemore testified that she has had back pain more recently. The back pain spreads from the middle of her back to her sides and runs all the way down to her legs and feet. Sizemore testified that it feels like hot water is running down her legs and she experiences sharp pains like she is "being stabbed in [her] toes with needles."

In addition to the physical impairments, Sizemore has been treated for depression. She stated that she cries often, gets overly emotional, spends time alone, and that her depression is triggered by her health. Sizemore takes 4 different medications for depression and anxiety, including Trazadone, Effexor, Amitriptyline, and Lorazepam, and she believes that these medications have helped with her depression since her August 2007 admission to Parkview Behavioral Health. Since her admission to Parkview, she has had outpatient counseling for her depression.

**D.     Testimony of Claimant's Husband**

Sizemore's husband, Ken Sizemore, also testified before the ALJ. (Tr. 52-53).  Ken Sizemore stated that before his wife's heart surgery, she was always active; but now, she is a totally different person.  Ken Sizemore further stated that since her surgery, his wife takes 44 pills a day, she is not as social, and her memory is not as good.

**E.     Testimony of the Vocational Expert**

VE Ronald Barkhaus also testified at the hearing. (Tr. 53-59).  The VE indicated that he reviewed Sizemore's work history and confirmed that he would advise the ALJ if his testimony had any discrepancy with the Dictionary of Occupational Titles ("DOT").

The ALJ then posed a series of hypotheticals to the VE, and in relevant part, the ALJ asked the VE to consider a hypothetical that was ultimately identical to the ALJ's RFC finding. *Compare* Tr. 16 *with* Tr. 54-56.  Specifically, the hypothetical considered the following: a high school educated individual with the same age and work experience as Sizemore who was limited to simple and repetitive sedentary work with the ability to attend and concentrate for 2 hours at a time; could sit 8 hours in an 8 hour workday with the ability to elevate the legs 12 inches; could stand/walk 2 hours in an 8 hour workday; could lift, carry, push, and pull 10 pounds occasionally and 5 pounds frequently; could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl; but could not climb ladders, ropes, or scaffolds; could not work near dangerous moving machinery or unprotected heights; could not do overhead work or work where there was a risk of receiving a deep cut; and, could have no concentrated exposure to extreme cold, extreme heat, wetness or humidity, and would have to avoid even moderate exposure to fumes, odors, dust, gases, and poor ventilation. (Tr. 54-56).

16

The VE testified that such an individual could not perform Sizemore's past work. (Tr. 54-56). However, there would be other jobs that this individual could perform. In particular, the VE testified that given the hypothetical, the following jobs would be available: mail processor/addresser, with 200 jobs regionally and 135,000 jobs nationally; order clerk, with 300 jobs regionally and 240,000 jobs nationally; and telephone or information clerk, with 100 jobs regionally and 1,000,000 jobs nationally.

The ALJ also asked the VE whether jobs would exist for an individual who was unable to sit, stand, and walk 8 hours a day and 40 hours a week on a regular and continuing basis. (Tr. 57). The VE testified that with these restrictions there would not be any type of competitive employment available. *Id.*

The VE was next asked whether jobs would exist if the hypothetical individual could not lift and carry any weight. (Tr. 57). The VE testified that even in sedentary jobs, an individual would have to lift 10 pounds occasionally and lift negligible amounts of weight (1 or 2 pounds) frequently, and that a total restriction on lifting any weight would eliminate these jobs. *Id.*

The VE was also asked whether the jobs that were available (as given in response to the hypothetical) would be affected by a requirement that the individual be able to take up to half an hour unexpected break on any given day to go to the bathroom or recover from dizziness. (Tr. 58). The VE stated that having to take an additional 30 minute break every day would eliminate all work. *Id.*

## F.    Decision of the ALJ

The ALJ issued his opinion on March 5, 2010. (Tr. 11-20). The ALJ determined that Sizemore met the insured status requirements of the Act through December 31, 2012, and that

Sizemore had not engaged in substantial gainful activity since the alleged onset date of February 6, 2007. Next, the ALJ determined that Sizemore had the following severe impairments: degenerative disc disease, chronic obstructive pulmonary disease, CAD, deep vein thrombosis, residual effects due to gastric bypass surgery, obesity, headaches, depression, and cognitive disorder. The ALJ determined that Sizemore did not have an impairment or combination of impairments that met or medically exceeded any of the Listings. Thus, the ALJ determined Sizemore's RFC, and concluded that Sizemore was capable of performing sedentary work subject to the following restrictions:

> [S]itting eight hours during an eight hour workday with the ability to elevate the legs twelve inches while sitting; standing and walking two hours during an eight-hour workday; lifting, carrying, pushing and pulling ten pounds occasionally and five pounds frequently; occasionally climbing ramps and stairs, balancing, stooping, kneeling, crouching, and crawling; no climbing ladders, ropes or scaffolds; no work at unprotected heights or around dangerous moving machinery; no overhead work; no work involving the risk of deep cuts; avoid concentrated exposure to extreme cold, extreme heat, wetness and humidity; avoid even moderate exposure to fumes, odors, dusts, gases and poor ventilation; and the work must be simple and repetitive but with the ability to attend and concentrate for two hours at a time.

(Tr. 16). Based on the RFC, the ALJ determined that Sizemore was unable to perform any of her past relevant work, consistent with the VE's testimony. Finally, the ALJ determined that sufficient jobs existed in the national economy that Sizemore could perform given the VE's testimony that someone with Sizemore's RFC could perform the duties of a mail processor/addresser, order clerk, and telephone or information clerk. The ALJ noted that the VE's testimony was inconsistent with the DOT due to the additional restriction that Sizemore be able to elevate her legs 12 inches; however, the VE explained that his testimony was based on his professional experience with the relevant job market and the manner in which jobs may be

performed. As such, the ALJ accepted the VE's explanation and determined that because the number of jobs available that Sizemore could perform was significant, Sizemore was not disabled as defined by the Act.

## II. Standard of Review

Since the Appeals Council denied Sizemore's request for review, the decision of the ALJ is the final decision of the Commissioner. *Liskowitz v. Astrue*, 559 F.3d 736, 739 (7th Cir. 2009). In its review, the district court will affirm the Commissioner's findings of fact and denial of disability benefits if they are supported by substantial evidence. *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008). Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971). This evidence must be "more than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). Thus, even if "reasonable minds could differ" about the disability status of the claimant, the Court must affirm the Commissioner's decision as long as it is adequately supported. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). In this substantial-evidence determination, the Court considers the entire administrative record but does not reweigh evidence, resolve conflicts, decide questions of credibility, or substitute the Court's own judgment for that of the Commissioner. *Lopez ex rel. Lopez v. Barnhart,* 336 F.3d 535, 539 (7th Cir. 2003). Nevertheless, the Court conducts a "critical review of the evidence" before affirming the Commissioner's decision, and the decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues. *Id.* Ultimately, while the ALJ is not required to address every piece of evidence or testimony presented, the ALJ must provide a "logical bridge" between the evidence and the conclusions. *Terry v. Astrue*, 580 F.3d 471, 475

(7th Cir. 2009).

Further, conclusions of law are not entitled to deference; so, if the Commissioner commits an error of law, reversal is required without regard to the volume of evidence in support of the factual findings. *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997).

### III.  Analysis

Disability benefits are available only to those individuals who can establish disability under the terms of the Act. *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998).  Specifically, the claimant must be unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).  The Social Security regulations create a five-step sequential evaluation process to be used in determining whether the claimant has established a disability. 20 C.F.R. § 404.1520(a)(4)(i)-(v).  The steps are to be used in the following order:

1. Whether the claimant is currently engaged in substantial gainful activity;

2.  Whether the claimant has a medically severe impairment;

3.  Whether the claimant's impairment meets or equals one listed in the regulations;

4.  Whether the claimant can still perform relevant past work; and

5.  Whether the claimant can perform other work in the community.

*Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001).  If the claimant is performing substantial gainful activity or does not have a severe medically determinable impairment, or a combination of impairments that is severe and meets the duration requirement, then the claimant will be found not disabled. 20 C.F.R. § 404.1520(a)(4)(i)-(ii).  At step three, if the ALJ

determines that the claimant's impairment or combination of impairments meets or equals an impairment listed in the regulations, disability is acknowledged by the Commissioner. 20 C.F.R. § 404.1520(a)(4)(iii). However, if a Listing is not met or equaled, in between steps three and four, the ALJ must then assess the claimant's RFC, which, in turn, is used to determine whether the claimant can perform her past work under step four and whether the claimant can perform other work in society at step five of the analysis. 20 C.F.R. § 404.1520(e). The claimant has the initial burden of proof in steps one through four, while the burden shifts to the Commissioner in step five to show that there are a significant number of jobs in the national economy that the claimant is capable of performing. *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004).

Sizemore argues that the ALJ failed to support his decision with substantial evidence because he failed to give proper weight to Sizemore's report of her daily activities and he failed to properly evaluate the opinions of her treating physicians and other medical sources.

For the reasons that follow, the Court agrees with both of Sizemore's arguments.

## A. Sizemore's Credibility and Report of Daily Activities

Sizemore contends that in making his credibility finding, the ALJ improperly equated her reported daily activities with an ability to work.

Because the ALJ is in the best position to observe witnesses, an ALJ's credibility determination will not be upset on appeal so long as it finds some support in the record and is not patently wrong. *Herron v. Shalala*, 19 F.3d 329, 335 (7th Cir. 1994). Indeed, "[o]nly if the trier of facts grounds his credibility finding in an observation or argument that is unreasonable or unsupported can the finding be reversed." *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006). However, as a bottom line, SSR 96-7p requires an ALJ to consider the entire case record

and articulate specific reasons to support his credibility finding. *Golembiewski v. Barnhart*, 322 F.3d 912, 915-17 (7th Cir. 2003). Further, while an ALJ is not required to provide a complete written evaluation of every piece of testimony and evidence, an ALJ cannot simply state that an individual's allegations have been considered or that the individual's allegations are not credible. *Rice v. Barnhart*, 384 F.3d 363, 370 (7th Cir. 2004); SSR 96-7p.

The process for evaluating a claimant's symptoms is organized around two major steps. First, the claimant must provide objective medical evidence of a medically determinable impairment or combination of impairments that reasonably could be expected to produce the alleged symptoms. 20 C.F.R. § 404.1529(a), (b). In Sizemore's case, the ALJ found that her medically determinable impairments could reasonably be expected to cause her alleged symptoms. (Tr. 17).

Second, after the first step is satisfied by the claimant, the ALJ must then evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities. 20 C.F.R. § 404.1529(a). While an ALJ may not reject subjective complaints of pain solely because they are not fully supported by medical testimony, the ALJ may consider that as probative of the claimant's credibility. *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000); SSR 96-7p. The regulations identify seven examples of the kinds of evidence the ALJ considers, in addition to objective medical evidence, when assessing the credibility of an individual's statements:

> (1) the individual's daily activities; (2) the location, duration, frequency, and intensity of the individual's pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or symptoms; (5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the

individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. § 404.1529(c); SSR 96-7p. The ALJ should not mechanically recite findings on each factor, but must give specific reasons for the weight given to the individual's statements. SSR 96-7p. Moreover, while a claimant's daily activities can be considered, the law cautions not to put "undue weight on a clamant's household activities in assessing the claimant's ability to hold a job outside the home," *Mendez v. Barnhart*, 439 F.3d 360, 362 (7th Cir. 2006), and to consider whether work is done under special circumstances. 20 C.F.R. § 404.1573(c). *See also Carradine v. Barnhart*, 360 F.3d 751, 755 (7th Cir. 2004) (ALJ failed to consider the difference between a person's being able to engage in sporadic physical activities and her being able to work eight hours a day five consecutive days of the week); *Rousey v. Heckler*, 771 F.2d 1065, 1070-71 (7th Cir. 1985) (holding that the ALJ's conclusion that the claimant was capable of performing sedentary work was not supported by substantial evidence because being able to perform sedentary work for very short periods of time does not support a conclusion that the claimant can perform sedentary work within the meaning of the Act). Therefore, while an ALJ may consider a claimant's daily activities when assessing credibility, the ALJ must explain perceived inconsistencies between a claimant's activities and the medical evidence. *Jelinek v. Astrue*, 662 F.3d 805, 812 (7th Cir. 2011).

Reviewing the ALJ's opinion, the Court concludes that the ALJ did not adequately consider the evidence of record in making his credibility determination, and the ALJ placed undue weight on Sizemore's household activities in assessing her ability to hold a job.

Here, the ALJ recounted Sizemore's testimony concerning her problems with shortness of breath, headaches, back pain, sadness, fatigue, lowered ability to concentrate, dizziness, and the need to elevate her legs. (Tr. 17).  However, the ALJ then discounted Sizemore's statements based on her own hearing testimony and her own previous reports of her activities (which were submitted in support of her application for benefits).  Specifically, the ALJ noted that her testimony and her activity reports indicated that she could get out of bed, dress and groom, help with housework, cook basic items, do college course work, drive a car, watch television, read, help with laundry and/or shopping, and meet with friends. (Tr. 17) (citing Tr. 175-78, 204-07)).  But the ALJ did not identify the inconsistencies between Sizemore's claimed activities and the medical evidence; rather, he only identified Sizemore's own reports as being inconsistent.  In other words, the ALJ did not discuss the extensive diagnostic studies revealing Sizemore's problems, and the ALJ did not discuss the opinions of her treating doctors concerning the extent to which her symptoms limited her ability to do basic work activities (other than briefly mentioning the opinion of Dr. Rich).[6]  Moreover, the ALJ did not provide an explanation for how the medical evidence contradicted Sizemore's subjective complaints concerning the intensity, persistence, and limiting effects of her symptoms.

The Court recognizes that the ALJ did indicate that he was relying on the state agent medical consultants, who gave opinions concerning Sizemore's mental and physical limitations. (Tr. 17-18).  However, the ALJ gave these opinions considerable weight on the sole basis that the opinions "agree[d] with the medical evidence."  But, to repeat, there was no identification of the medical evidence (objective or otherwise) and there was no explanation of how the medical

---

[6]*See infra* pp. 26-30, for the Court's determination that the ALJ failed to provide a sufficient discussion of Dr. Rich's treatment records and the weight afforded to Dr. Rich's opinion.

evidence contradicted Sizemore's statements—all of which must be addressed when assessing the claimant's credibility. *See* 20 C.F.R. § 404.1529(c); SSR 96-7p ("[i]n determining the credibility of the individual's statements, the adjudicator must consider the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record").  Not only did the ALJ fail to identify and consider the medical evidence, he also failed to indicate the weight assigned to the evidence and explain how the evidence supported his finding that Sizemore was not credible.  As a result, the ALJ failed to sufficiently support his credibility finding.

In addition, the ALJ improperly equated Sizemore's minimal activities of daily living as evidence of an ability to perform work. *See* 20 C.F.R. § 404.1572(c).  Although the ALJ was permitted to consider Sizemore's daily activities in analyzing Sizemore's credibility and in making the disability determination, in this case, the ALJ failed to consider the fact that Sizemore could not do household chores or other daily activities that required lifting, carrying, walking, or standing on a sustained basis. *See, e.g.,* 20 C.F.R. § 404.1573(c).  The medical evidence and Sizemore's statements indicate that her symptoms regularly caused her to need the assistance of her husband and to take breaks by laying down.  It was the ALJ's duty to provide a logical bridge between this evidence and his conclusion that she could work on a continued and sustained basis, but this was not done.

In the present case, the ALJ failed to adequately consider the record evidence in assessing Sizemore's crediblity and the ALJ failed to consider the difference between

Sizemore's ability to engage in limited physical daily activities and her ability to work eight hours a day five consecutive days of the week. *See Carradine*, 360 F.3d at 755-56. As a result, the Court finds that the ALJ's determination of Sizemore's credibility was unsupported and patently wrong. *See Prochaska*, 454 F.3d at 738; *Herron*, 19 F.3d at 335. Accordingly, remand is necessary.

**B.      Sizemore's Limitations and Medical Source Evidence**

Sizemore contends that the ALJ erred by failing to adequately consider and weigh the opinions of her treating physicians and other acceptable medical sources.[7]

A treating physician's opinion regarding the nature and severity of a medical condition is entitled to controlling weight if the opinion is supported by the medical findings and consistent with substantial evidence in the record. *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004) (*citing* 20 C.F.R. § 404.1527(d), (e)). However, while the treating physician's opinion is important, it is not the final word on a claimant's disability. *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007). An ALJ, thus, may discount a treating physician's medical opinion if it is internally inconsistent or inconsistent with other evidence in the record. *Clifford v. Apfel*, 227 F.3d 863, 871 (7th Cir. 2000). Ultimately, an ALJ may discount a treating physician's opinion but an ALJ must offer "good reasons" for doing so. *Scott v. Astrue*, 647 F.3d 734, 739 (7th Cir. 2011).

---

[7]A "treating source" means a claimant's own physician, psychologist, or other acceptable medical source who provides, or has provided, the claimant with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with the claimant; and, "acceptable medical source" refers to one of the sources described in § 404.1513(a), which in relevant part includes licensed physicians and licensed or certified psychologists, who provides evidence about a claimant's impairments (whether a treating, non-treating, or non-examining source). *See* 20 C.F.R. § 404.1502.

Once the ALJ articulates reasons for rejecting the treating physician's opinion, the ALJ still must determine what weight the physician's opinion is due under the applicable regulations. 20 C.F.R. § 404.1527(d)(2); *see Larson v. Astrue*, 615 F.3d 744, 751 (2010). Factors the ALJ should consider when determining the weight to give the treating physician's opinion include the length of treatment and frequency of examination, whether the physician supported his opinion with sufficient explanations, the extent to which the treating physician presents relevant evidence to support his opinion, whether the physician specializes in the medical conditions at issue, and the consistency of the opinion. 20 C.F.R. § 404.1527(d); *see Elder*, 529 F.3d at 415; *Hofslien v. Barnhart*, 439 F.3d 375, 377 (7th Cir. 2006).

In the end, the disability determination is ultimately a decision reserved for the Commissioner. 20 C.F.R. § 404.1527(e); SSR 06-03p; SSR 96-5p. However, the ALJ is required to consider the evidence, including additional evidence submitted by governmental and nongovernmental agencies and opinions by state agent medical and psychological consultants, 20 C.F.R. § 404.1512(b), and the ALJ must decide the weight to be afforded the evidence and explain his consideration of the evidence. *See* 20 C.F.R.§ 404.1527(d), (f); SSR 06-03p.

### *Physical Impairments*

Sizemore argues that the ALJ erred by providing an insufficient explanation for the weight assigned to Dr. Rich's opinion relative to her physical impairments. The Court agrees.

In his opinion, the ALJ considered the fact that Dr. Rich, Sizemore's treating cardiologist, offered an opinion on October 30, 2008 about Sizemore's RFC. (Tr. 18) (citing Tr. 847-49)). The extent of the ALJ's discussion concerning Dr. Rich's opinion is as follows:

> [Dr. Rich's October 30, 2008 RFC is] for the most part, incorporated into the above residual functional capacity showing an ability to sit for more than six

hours per day and to stand/walk for the remainder of the day. On these issues, Dr. Rich is well-supported. However, there is no support for Dr. Rich's conclusion that the claimant cannot lift or carry anything, especially given the claimant's own testimony that she can lift some lighter objects when shopping or cooking.

(Tr. 18) (citing Tr. 847-49)).

Here, the reasons given for accepting portions and discounting other portions of Dr. Rich's opinion do not meet the requisite standard. Admittedly, the ALJ noted that Dr. Rich was Sizemore's treating cardiology specialist; however, the ALJ did not consider Dr. Rich's other treatment notes and discuss whether they were inconsistent with his own records or with the other record evidence. The ALJ's failure to consider Dr. Rich's other treatment records along with the record evidence is a great omission considering the fact that Dr. Rich has been treating Sizemore since she underwent her triple bypass open heart surgery in February of 2007 (the date Sizemore claims to have become disabled) and considering the fact that Dr. Rich's medical speciality is dealing with heart disorders (a basis for Sizemore's claimed disabling limitations).

Moreover, while the ALJ *said* that Dr. Rich's opinion was "well-supported" with regard to Sizemore's ability to stand and walk, the ALJ did not consider the fact that on multiple occasions (including on October 30), Dr. Rich actually opined that Sizemore was not capable of returning to work for an undetermined duration. In addition, the ALJ did not identify the so-called supporting evidence which indicated that Sizemore could stand/walk/sit for an 8 hour workday. For instance, the ALJ failed to acknowledge and then discredit the various records which suggested that Sizemore was further limited, including: a cardiac rehabilitation report from August 2007 indicating that Sizemore's exercise tolerance had improved to only 60 minutes of light to moderate intensity; a report from January 2008 indicating that Sizemore went to the emergency room with complaints of back pain, arm heaviness, shortness of breath, and

nausea, which were believed to be related to her recent increased physical activity; Dr. Rich's January 2008 report that she was unable to walk more than 5 minutes at 1.8 miles per hour; and, Sizemore's inability to walk on the treadmill during a nuclear cardiology stress test in August 2009 due to shortness of breath.

While the ALJ was not required to address every piece of evidence or testimony presented, the ALJ must provide a "logical bridge" between the evidence and his conclusions. *Terry*, 580 F.3d at 475. In this case, the ALJ did not examine the relevant medical evidence and sufficiently explain why the record supported a finding that Sizemore was capable of sitting/standing/walking for 8 hours every workday.

Similarly, the ALJ's conclusion that there was "no support" for Dr. Rich's opinion that Sizemore could not lift or carry anything, given Sizemore's admitted ability to lift some light objects, was not adequately supported. First, as already discussed, the ALJ did not properly evaluate Sizemore's testimony and her ability to perform daily activities. Second, even if the ALJ disbelieved Dr. Rich's conclusion that Sizemore could not lift anything and therefore she was capable of lifting *some* weight, then the ALJ needed to explain the basis for his finding. But the ALJ did not do this. Instead, the ALJ concluded that Sizemore could lift/carry/push/pull ten pounds occasionally and five pounds frequently, based on the opinions of state agent reviewers Dr. Ruiz and Dr. Corcoran, who opined that Sizemore could lift/carry/push/pull 10 pounds occasionally and frequently. The ALJ's reason for giving the state agent opinions "significant weight," was because their opinions "agree[d] with the medical evidence." (Tr. 18). Yet again, while the ALJ *stated* that the reviewing agents' opinions were supported by the medical evidence, the ALJ did not identify the evidence that: supported the state agents' opinions,

supported the ALJ's finding that Sizemore was capable of lifting 10 pounds occasionally and 5 pounds frequently; or, supported the discounting of Dr. Rich's treating opinion that she could lift no weight. *See Martinez v. Astrue*, 630 F.3d 693, 698 (7th Cir. 2011) ("[t]he administrative law judge, perhaps forgetting that he was required to give 'good reasons' for not giving the well-supported opinion of a treating physician 'controlling weight,' relied without explanation on the contrary views of two physicians who did not examine [the claimant] though they consulted her medical records.") (internal citations omitted). Therefore, the Court is unable to conclude that the ALJ adequately considered the evidence of record and provided a sufficient explanation for the weight assigned to the opinion of Dr. Rich, Sizemore's long time treating cardiologist.

### *Mental Impairments*

The Court finds that the ALJ also erred in giving short shrift to the potential limitations caused by Sizemore's mental impairments. This mistake led the ALJ, in turn, to improperly evaluate whether her mental impairments met a Listing, and to inadequately support the RFC determination.[8]

In this case, the ALJ determined that Sizemore had "severe" limitations due to depression and cognitive disorder. (Tr. 13). Thereafter, the ALJ used the special technique as set forth in 20 C.F.R. § 404.1520a, which is used to analyze whether a claimant has a medically determinable mental impairment and whether that impairment causes functional limitations. *See Craft v. Astrue*, 539 F.3d 668, 674 (7th Cir. 2008). The special technique requires the ALJ to evaluate the claimant's "pertinent symptoms, signs, and laboratory findings" to determine whether the

---

[8]Relative to Sizemore's mental limitations, the ALJ incorporated his step 3 Listing findings into his RFC determination. (Tr. 18). As a result, the Court considers the combined findings made by the ALJ. (Tr. 15-18).

claimant has a medically determinable mental impairment, and if the claimant does, then the ALJ must document that finding and rate the degree of functional limitation in four broad areas: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation (known as the B criteria). 20 C.F.R. § 404.1520a(b)(1), (c)(3). If the ALJ rates the first three functional areas as none or mild and the fourth area as none, then generally the impairment is not considered severe. 20 C.F.R. § 404.1520a(d)(1). Otherwise, the impairment is considered severe, and the ALJ must determine whether it meets or is equivalent in severity to a listed mental disorder, which is done by comparing the medical findings and the rating of the degree of functional limitation to the criteria of the appropriate Listing. *Id*. § 404.1520a(d)(2). If the mental impairment does not meet or is not equivalent to any Listing, then the ALJ will assess the claimant's RFC. *Id*. § 404.1520a(d)(3). The ALJ must document use of the special technique by incorporating the pertinent findings and conclusions into the written decision. *Id*. § 404.1520a(e). The decision must elaborate on significant medical history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the mental impairment's severity. *Craft*, 539 F.3d at 675. Further, when conducting the RFC analysis, the finding must be assessed based on all the relevant evidence in the record, it must consider all medically determinable impairments even if not considered "severe," it must include an evaluation of the evidence favoring the claimant as well as the evidence favoring the claim's rejection, and it must be supported by substantial evidence. 20 C.F.R. § 404.1545; *Golembiewski*, 322 F.3d at 917; *Zurawski v. Halter*, 245 F.3d 881, 888 (7th Cir. 2001); *Clifford*, 227 F.3d at 873.

The ALJ did not adequately recite Sizemore's mental medical history in conducting the special technique, in determining whether Sizemore's mental impairments met a Listing, and in determining Sizemore's RFC. In considering Sizemore's mental limitations, the ALJ came to the conclusion that Sizemore only suffered from mild difficulties in her activities of daily living and mild difficulties in her social functioning, based solely on Sizemore's self-reported limitations. (Tr. 15) (citing Tr. 26-60, 145-54, 175-78, 182-91)). Simply put, the ALJ failed to indicate his consideration of Sizemore's various mental health records in making these determinations.

Furthermore, in deciding that Sizemore suffered from moderate limitations with regard to her concentration, persistence, or pace, the ALJ cited to records which contained Sizemore's August 2007 admission to Parkview, her treatment sessions with Dr. Shao, her consultative examination with psychologist Dr. Bundza, and her mental assessment performed by Dr. Gange. (Tr. 15) (citing 275-92, 333-43, 551-72)). But the ALJ did nothing more than simply acknowledge the presence of this evidence in the record. In other words, the ALJ did not consider their contents.

Had the ALJ considered and discussed the contents of Sizemore's mental medical records, then he would have been forced to reconcile the inconsistencies between his conclusions and the findings made by state agents Dr. Gange and Dr. Bundza—opinions which were given "considerable weight" by the ALJ. (Tr. 18).

For instance, the state agents opined that Sizemore was moderately restricted in her activities of daily living; moderately restricted in her ability to maintain concentration, persistence or pace; moderately limited in her ability to complete a normal workday and

workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and, she was assigned a GAF score of 50. *See Jelinek*, 662 F.3d at 812 (noting that a GAF score of 50 corresponds to serious impairment of functioning). The ALJ did not indicate how these conclusions supported the ALJ's conclusion that Sizemore did not meet a Listing or that she did not require further mental limitations in her RFC, such as additional restrictions relative to her concentration, persistence, and pace.

Moreover, relative to Sizemore's mental abilities, the ALJ gave considerable weight to the state agents' opinions that Sizemore could perform simple repetitive tasks, based on the sole reason that these opinions "agree[d] with the medical evidence." (Tr. 18). The ALJ did not provide any further explanation. And without identifying the "the medical evidence" with which the ALJ agreed with or disagreed with, the Court is unable to conduct an adequate review of whether the ALJ's reliance on the state agent opinions over the opinions of treating physicians was supported by substantial evidence.

The Court further notes that had the ALJ considered the contents of Sizemore's mental medical records, then the ALJ would have discussed and determined the weight to be given to Sizemore's extremely low GAF scores ranging from 30 to 50 during the course of her treatment with Dr. Shao, her increased need for anti-depressants, her ongoing prescription adjustments, and her continued need for therapy. Because the ALJ did not mention this evidence, the Court cannot tell whether the ALJ considered and rejected it, and why he might have done so.

The ALJ's error to properly consider and weigh the medical evidence relative to Sizemore's mental limitations is further compounded by the fact that the ALJ's credibility determination cannot stand based on the reasons already discussed.

The Court also agrees with Sizemore's remaining argument, which is the ALJ provided an inadequate explanation for affording no weight to Dr. Merkle's December 2007 consultative examination findings.

After examining Sizemore, Dr. Merkle opined that she was unable to engage in gainful activity, that she suffered a marked limitation of functional capacity due to her underlying disease, surgical complications, and major depression, and that her prognosis for any significant improvement in the near future was poor. (Tr. 573-77). The ALJ afforded Dr. Merkle's opinion "no weight" because according to the ALJ, Dr. Merkle placed most of his emphasis on Sizemore's mental impairments which was outside of his area of expertise and Dr. Merkle did not reference "significant medical evidence." (Tr. 18). The ALJ also discounted Dr. Merkle's opinion because the ALJ had already decided that Sizemore's "mental impairments [did] not result in disability." (Tr. 18).

The ALJ has a duty to evaluate acceptable medical sources and other sources, and decide the weight to be given to each source. 20 C.F.R.§ 404.1527(d); SSR 06-03p. The ALJ was entitled to reject Dr. Merkle's opinion, so long as he supported his position with substantial evidence. Here, the ALJ improperly characterized Dr. Merkle's report. Dr. Merkle did in fact document Sizemore's significant treatment history and he documented his physical exam findings. Moreover, affording Dr. Merkle's opinion no weight simply because he referenced the effect of Sizemore's combined physical and mental limitations is an insufficient explanation.

The ALJ needed to identify and discuss the evidence that the ALJ believed contradicted Dr. Merkle's assessment. Additionally, the ALJ discounted Dr. Merkle's opinion on the basis that Sizemore's mental impairments did not result in a finding of disability—but the Court has already determined that the ALJ inadequately discussed the record evidence with respect to Sizemore's mental (and physical) limitations.

While it is true that the ALJ limited Sizemore's RFC to simple, repetitive work with the ability to attend and concentrate for two hours at a time, the ALJ failed to discuss the extensive information contained in Sizemore's mental medical records which supported possible further work restrictions and/or a finding of disability, and failed to adequately explain the reasons for affording particular weight to the mental medical evidence, as identified in this Order. For these reasons, the Court concludes that there is not an accurate and logical bridge between the ALJ's recitation of the mental medical evidence and the decision that Sizemore was not disabled or further limited in her ability to work. *See Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) (noting that the ALJ has an obligation to consider all relevant evidence and cannot "cherry-pick" facts that support a finding of non-disability while ignoring evidence that points to a disability finding).

### *Combination of Impairments*

Sizemore has a host of significant physical and mental medical conditions, as discussed, and having found that one or more of her impairments was "severe," the ALJ needed to support his decision with substantial evidence in determining whether her impairments were medically equivalent to a Listing and in accounting for her limitations in his RFC assessment. 20 C.F.R. §§ 404.1520, 404.1520a, 404.1526, 404.1527, 404.1545. This was not done in this case.

In addition, because the ALJ's RFC determination is not supported by such relevant evidence as a reasonable mind might accept as adequate to support a conclusion, the Court has no way of knowing if Sizemore could actually perform the functional demands and job duties of her past occupation, or whether Sizemore could perform other work in the national economy on a sustained basis.[9] 20 C.F.R. § 404.1520(f), (g); *Tom v. Heckler*, 779 F.2d 1250, 1252-53 (7th Cir. 1985). The record does not command a determination that Sizemore should be awarded benefits, but the ALJ has not adequately supported his conclusions.

### IV. Conclusion

For the foregoing reasons, the Court **GRANTS** Sizemore's request to remand the ALJ's decision. [DE 1]. Accordingly, the Court now **REMANDS** this case to the Commissioner for further consideration, consistent with the conclusions in this Opinion and Order.

SO ORDERED.

ENTERED:   March 26, 2012

_____/s/ JON E. DEGUILIO_____
Judge
United States District Court

---

[9]Because the RFC failed to incorporate all of Sizemore's limitations (as discussed *supra*), the hypothetical questions posed to the VE, which were based on the unsupported RFC, do not generate accurate information about the work Sizemore can do and the jobs available to her. At the end of the day, the Commissioner bears the burden at step five, not Sizemore, and any hypothetical ultimately posed to a VE "must include all limitations supported by medical evidence in the record." *Stewart v. Astrue*, 561 F.3d 679, 684-85 (7th Cir. 2009).